<u>**NOT FOR PUBLICATION**</u>

**UNITED STATES DISTRICT COURT
DISTRICT OF NEW JERSEY**

| | | |
|---|---|---|
| TRACY McDOWELL, | : | |
| Plaintiff, | : | Civil Action No. 03-2488 (KSH) |
| v. | : | |
| AXSYS TECHNOLOGIES CORPORATION, and MITCHELL DUTTON, | : | **OPINION** |
| Defendants. | : | |

**KATHARINE S. HAYDEN, U.S.D.J.**

  Plaintiff Tracy McDowell has sued defendants Axsys Technologies Corporation ("Axsys") and Mitchell Dutton ("Dutton") in his individual capacity (collectively "defendants") on grounds that they terminated him in violation of the Age Discrimination in Employment Act ("ADEA") and interfered with his rights under the Employee Retirement Income Security Act ("ERISA"). Before the Court is defendants' motion for summary judgment on all counts. For the reasons discussed below, the Court **grants** summary judgment as to the ERISA claim. The Court also **grants** summary judgment as to the ADEA claim asserted against Dutton in his individual capacity, but **denies** summary judgment as to the ADEA claim asserted against Axsys.

I.  **BACKGROUND**

AST Bearings ("AST") is a New Jersey division of Axsys, whose primary function is the distribution of mechanical bearings built to comply with customer specifications. AST receives orders from customers and other divisions of Axsys and then processes and ships these orders as instructed. Michael Dutton is the former president of AST.

McDowell began working as a shipping clerk for AST at age 22, and remained in that position until his dismissal on December 31, 2001 when he was 57. Up until his final two years of service, McDowell's job responsibilities remained consistent. He would receive prepackaged orders from other departments and ship these packages according to their corresponding instructions. Sometime between 1999 and 2000, AST installed a computer tracking system, which resulted in a new job responsibility for McDowell – entering order numbers into the new system.

On average, McDowell would process and ship between 80-100 packages a day. He was the only shipping clerk, and when there were too many packages for him to handle, his supervisor, Dan Ross, and other AST employees would assist him.

On occasion, when packages labeled "Must Go Today" were not ready in time for common carrier pickup, McDowell would leave the orders on the table for pick up on the following day. Defendants argue that this practice was unacceptable and a "source of on-going complaints from customers and within AST." (See Defts' Brief, at 7, 8; Certification of Rosemary J. Bruno, Ex. C, Deposition of Dan Ross, at 14-17.) According to defendants, when McDowell held packages for next day delivery AST could not assure timely shipment per customer instructions, which had a negative impact on customer relations and adversely affected day-to-day operations. (See Bruno Cert., Ex. F, Deposition of Dan Fox, at 20-20 to 21-6; Defts' Brief, at 12.)

McDowell claims that he was never once reprimanded for failing to ship packages on a timely basis, and that none of his performance evaluations makes reference to untimely shipping. (Certification of Samuel J. Halpern, Ex. A, Deposition of Tracy McDowell, at 72-7 to 72-10.) He also asserts that he did not "habitually" leave packages on the table, and further that his supervisor Ross admitted leaving packages marked "Must Go Today" on the table because he could not get them out in time. (See Pltf's Opposition, at 1.)

Defendants assert there were other problems with McDowell's job performance. (Defts' Brief, at 9.) They allege that McDowell sent out packages in a manner other than that specified in the directions; that he would send packages to the wrong location; and that he carelessly entered data into the computer system. (Certification of David Ryder, at ¶ 5; Bruno Cert., Ex. I, Deposition of Theodore Drake, at 7-14 to 7-23; Bruno Cert., Ex. D, Deposition of Mitchell Dutton, at 16-3 to16-16, 17-8 to17-16, 30-11 to 31-4.) These shipping errors and data entry mistakes, defendants assert, extended back in time, led to regular complaints by customers and other AST employees, and negatively affected day-to-day operations. (See Ryder Cert., at ¶¶ 5, 7, 10; Bruno Cert., Ex. D, Dutton Dep., at 16-19 to 16-24, 31-5 to 31-11; Supplemental Certification of Rosemary J. Bruno, Ex. B, Deposition of Dan Ross, at 47-16 to 48-2.) AST employees testified in depositions that they personally witnessed occasions where McDowell would not get a package out as instructed, and that they received complaints from customers and/or from other AST offices that shipments arrived late. (See, e.g., Bruno Cert., Ex. I, Drake Dep., at 13; Bruno Cert., Ex. E, Deposition of John Wallace, at 11.) Dutton testified that he too received customer and co-worker complaints, but he could not recall specifics. (See Bruno Cert., Ex. D, Dutton Dep., at 30-17 to 30-24.)

It is undisputed that McDowell was twice approached by an AST officer about performance problems. On January 10, 2000, David Ryder, then vice president of finance and administration of AST, met with McDowell concerning his data entry errors and warned him that AST "would have no tolerance for inaccuracies made during receiving, put away, picking or shipping." (Ryder Cert., Ex. A, Letter to Tracy McDowell's Personnel File dated January 10, 2000.) And in early October 2001, Dutton confronted McDowell about his poor performance. McDowell argues that these were the only two occasions when he was made aware of job-performance problems. (See Bruno Cert., Ex. B, McDowell Dep., at 44-6 to 44-18; 91-7 to 91-22.) Defendants disagree, alleging that there were many instances when AST officers would tell McDowell about their concerns over his job performance. (Bruno Cert., Ex. D, Dutton Dep., at 16-25 to 17-16; Bruno Cert., Ex. B, McDowell Dep., at 91-7 to 23; Bruno Cert., Ex. I, Drake Dep., at 8-6 to 8-7, 8-20 to 9-20.)

McDowell denies shipping packages to the wrong address or wrong customer and asserts that if mistakes occurred, they were caused by the office. (Id. at 67-16 to 67-20; 68-2 to 68-15.) In his deposition he testified that he received only three written evaluations during his employment at AST because the company did not use a written evaluation process until 1998. (Id. at 46-22 to 46-24.) Before then, employees found out they were getting a raise (and, apparently, that their performance was satisfactory) when they received their paychecks. From time to time, McDowell claims he received annual raises. (Id. at 46-11 to 46-12; 45-17 to 46-1.) It is undisputed that McDowell generally received average ratings on his written evaluations.

Defendants rely on comments in McDowell's 1999 and 2000 written evaluations. The comment section in the 1999 evaluation instructed McDowell to improve communications with the lab for better order flow, and McDowell admittedly made no attempt to do this. (See Bruno Cert.,

Ex. G, 1999 Evaluations; Bruno Cert., Ex. B., McDowell Dep., at 152-6 to 152-13.) McDowell claims that in the 2000 evaluation, he was initially rated as "exceeding job requirements" in the quality, productivity, independence, and availability categories. He asserts that later on someone changed that comment to "meets job requirements." (See Bruno Cert., Ex. B, McDowell Dep., at 152-21 to 153-4.) Defendants deny this. In support, they have submitted a certification by Helena Burnette, who signed the evaluation that reflects average ratings in most categories, preventing McDowell from receiving a raise. (Certification of Helena Burnette, at ¶ 6; Ex. A, 2000 Evaluation with Letter to McDowell's File (explaining he did not sign evaluation because was not offered a raise).) Defendants assert that McDowell's poor job performance persisted after these written comments, leading to his termination. (See Defts' Brief, at 13.)

     Defendants have produced record evidence that management level AST employees spoke to Dutton about McDowell's ongoing failures to ship materials as instructed and urged Dutton to fire him. (See, e.g., Bruno Cert., Ex. F, Deposition of Dan Fox, at 15-5 to15-17; Bruno Cert., Ex. I, Drake Dep., at 10-2 to 10-22; Ryder Cert., ¶ 10.) Dutton fired him in October 2001, but McDowell was kept on the payroll through December 31, 2001. (See Bruno Cert., Ex. D, Dutton Dep., at 39-10 to 39-21.) Defendants concede, for purpose of this motion only, that when Dutton terminated McDowell, he made this statement: "I think you've been here too long, you should retire." In that same conversation Dutton offered McDowell a severance package that McDowell ultimately rejected. (Id. at 86.) AST filled his position with a younger employee named Tong Suggs. Suggs was paid less money and given less vacation time. (See Bruno Cert., Ex. B, McDowell Dep., at 128-19 to 129-9.)

After exhausting his administrative remedies, McDowell filed the instant two count complaint asserting ADEA claims against Axsys and Dutton in his individual capacity, and an ERISA claim against Axsys.

## II.     STANDARD OF REVIEW

Summary judgment is appropriate where the moving party establishes that "there is no genuine issue as to any material fact" such that it is "entitled to judgment as a matter of law." Fed. R. Civ. P. 56(c). At the summary judgment stage, the Court's "function is not [itself] to weigh the evidence and determine the truth of the matter but to determine whether there is a genuine issue for trial." Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 249 (1986). In so doing, the Court must construe the facts and all inferences that reasonably could be drawn therefrom in a light most favorable to the non-moving party. Bailey v. United Airlines, 279 F.3d 194, 198 (3d Cir. 2002).

A dispute about a material fact is "genuine" if "the evidence is such that a reasonable jury could return a verdict for the non-moving party." Anderson, 477 U.S. at 248. The party opposing a summary judgment motion "may not rest upon the mere allegations or denials of his pleading"; rather, he must set forth specific facts and provide sufficient evidence showing that there is a genuine issue for trial. Id. at 248-49. "Substantive law will identify which facts are material," and "[o]nly disputes over facts that might affect the outcome of the suit under the governing law" will defeat a summary judgment motion. Id. at 248. In other words, disputes over "irrelevant or unnecessary" facts will not preclude the Court from granting summary judgment in the moving party's favor. Id.

**III.    DISCUSSION**

    **A**.    **Count I:  McDowell's ADEA claims**

Defendants argue that: (1) dismissal of Count I as against Dutton is required as a matter of law because there is no individual liability under the ADEA; and (2) that McDowell's ADEA claim against Axsys should be dismissed because he failed to produce evidence that shows he is qualified for his position, and alternatively that he has not produced sufficient evidence to discredit Axsys's proffered reason for firing him, or to establish that age was more likely than not the motivating factor.  The Court will discuss each argument in turn.

        1.    <u>ADEA claim asserted against Dutton</u>

Defendants argue that McDowell's ADEA claim against Dutton must be dismissed because there is no individual liability under the ADEA.  (Defts' Brief, at 19.)  McDowell concedes that supervisors may not be held individually liable under the ADEA, but argues that Dutton is a "policymaker" and thus individually liable as "represent[ing] the embodiment of the business." (Pltf's Opposition, at 4.)

The ADEA makes it unlawful for an "employer" to discriminate on the basis of age against its employees.  29 U.S.C. § 623(a).  The Act defines "employer" as "a person engaged in an industry affecting commerce who has twenty or more employees for each working day in each of twenty or more calendar weeks in the current or preceding calendar year . . .[or] any agent of such a person . . . ."  29 U.S.C. § 630(b).  The Third Circuit has not specifically addressed whether the language of the ADEA imposes individual liability on company officers, supervisors, or managers.  But there is unanimity among district courts in this circuit that the ADEA does not provide for individual liability.  <u>See</u>, <u>e.g.</u>, <u>Horvath v. Rimtec Corp.</u>, 102 F. Supp. 2d 219, 227-28 (D.N.J.

2000); Kennedy v. Chubb Group of Insurance Companies, 60 F. Supp. 2d 384, 390 (D.N.J. 1999); Kohn v. AT & T Corp., 58 F. Supp. 2d 393 (D.N.J. 1999); DeJoy v. Comcast Cable Communication Inc., 941 F. Supp. 468, 474 (D.N.J. 1996); Marion v. City of Philadelphia Water Department, 161 F. Supp. 2d 381 (E.D. Pa. 2001); Cohn v. Temple Physicians, 11 F. Supp. 2d 733, 736 (E.D. Pa. 1998); Violanti v. Emery Worldwide, 847 F. Supp. 1251 (M.D. Pa. 1994). The majority of circuit courts that have addressed this issue have also concluded that the ADEA does not provide for individual liability. See, e.g., Stults v. Conoco, 76 F.3d 651, 655 (5th Cir. 1996); Smith v. Lomax, 45 F.3d 402, 403 n. 4 (11th Cir. 1995); Birkbeck v. Marvel Lighting Cop., 30 F.3d 507 (4th Cir. 1994); Miller v. Maxwell's International Inc., 991 F.2d 583 (9th Cir. 1993).

These decisions, for the most part, employ the same rationale: the numerosity requirements of the ADEA (an employer employ at least 15 people before jurisdiction can be invoked; damages are calculated based on the number of employees working for the company in question) demonstrate Congress's intention to preclude individual liability for discriminating company officers, supervisors, or managers. Many of these courts have also concluded that the term "agent" in the definition of "employer" is an expression of respondeat superior liability. As such, employees with the authority to make discharge decisions for their employers are not exposed to individual liability on the basis that they are their employer's agents.

For example, the Fourth Circuit held that a vice president of a corporation who was principally responsible for the plaintiff's termination was not a proper defendant because the ADEA limits civil liability to the employer. See Birkbeck, 30 F.3d at 511. The Court reasoned that the numerosity requirements of the ADEA indicate there should be no individual liability for officers making personnel decisions. Holding that the underlying purpose of these requirements is

to reduce the burden of the ADEA on small businesses, the court construed "agent" as creating respondeat superior liability only. To construe it otherwise would place an unnecessary burden on those who routinely make personnel decisions for companies employing 20 or more persons. "Employer liability ensures that no employee can violate the civil rights law with impunity, a safeguard that has proven sufficient with respect to Title VII, the ADEA's closes statutory kin." Id.

Similarly, the Ninth Circuit found no individual liability where a plaintiff pursued sex and age discrimination claims against the CEO of the defendant company, two general managers, and two managers because the ADEA and Title VII statutory schemes included numerosity requirements. See Miller, 991 F.2d at 587-88. "If Congress decided to protect small entities with limited resources from liability," reasoned the Court, "it was inconceivable that it intended to allow civil liability to run against individual employees." Id. at 587. The Court also rejected the argument that supervisory personnel and other agents of the employer are themselves employers for purposes of liability. Id. at 587-588.

The Third Circuit has also applied the numerosity requirements rationale, albeit in the context of Title VII litigation. In so doing, the Circuit concluded that 42 U.S.C. § 2000e(b) does not provide for individual liability of company employees. See Sheridan v. E.I. DuPont de Nemours and Co., 100 F.3d 1061, 1077-78 (3d Cir. 1996); Emerson v. Thiel College, 296 F.3d 184, 190 (3d Cir. 2002) (holding individual employees are not liable under Title VII pursuant to Sheridan); Dici v. Commonwealth of Pennsylvania, 91 F.3d 542, 552 (3d Cir. 1996) ("[W]e conclude, for the reasons previously given by the court in Sheridan and the other courts of appeals, that individual employees cannot be held liable under Title VII."). In Sheridan, the plaintiff argued that Title VII did not contain explicit language excluding individuals from liability, and that

because the definition of "employer" includes "any agent," a general manager could be jointly liable with his/her employer based on the laws of agency. The Court disagreed and held that, among other persuasive reasons, the presence of numerosity requirements in Title VII strongly suggests Congress's intent not to subject individual employees to liability. Id. at 1077.

The ADEA and Title VII serve the same purpose – to prohibit discrimination against certain classes of people in the workplace. Their statutory frameworks are similar. Both laws limit liability to employers that employ a particular number of employees, and both include "agent" within the definition of "employer." Compare 42 U.S.C. § 2000e(b), with 29 U.S.C. §§ 630(b), and 203(d). As caselaw has developed, courts have regularly analyzed issues arising under one of these statutes through jurisprudence that has developed about the other. Indeed, courts routinely use Title VII and ADEA caselaw interchangeably. See, e.g., Newman v. GHS Osteopathic, Inc., Parkview Hosp. Div., 60 F.3d 153, 157 (3d Cir. 1995). This Court concludes that inasmuch as the Third Circuit has made it clear that employees may not be held individually liable under Title VII, and Title VII's statutory framework is virtually identical to the ADEA's, the ADEA precludes personal capacity suits against individuals.

In his opposition, McDowell argues that Dutton is a high level "policymaker" and not just a supervisor, and that this distinguishes his lawsuit from the holdings in the above cases. Defendants respond by asserting that McDowell has misinterpreted the law – the relevant cases do not "depend upon the position of the individual employee but rather are predicated upon the language of the statute." (Defts' Reply Brief, at 3.) The Court agrees with defendants, guided by the holding in Sheridan.

In deciding Sheridan, the Third Circuit explicitly held that "individual employees" are not individually liable under Title VII, and rejected the plaintiff's agency arguments. The Court held that Title VII's statutory framework indicated Congress's intention to protect small business and individual employees from the burdens the statute imposes. In its holding, the Court made no distinction among employees on their job titles or responsibilities. See Sheridan, 100 F.3d at 1078. Since then, the Third Circuit has applied Sheridan to preclude executives and high level employees from liability. For example, in Kachmar v. SunGard Data Systems, Inc., 109 F.3d 173 (3d Cir. 1997), the Court held that a vice president of human resources was not exposed to individual liability under Title VII. And, in Emerson, the Court held that a former president and vice president were not exposed to individual liability under Title VII because the plaintiff did not aver that he was employed by either one and individual employees are not subject to liability pursuant to Sheridan. 296 F.3d 184, 190.

Further, the Sheridan decision relied heavily on the Ninth Circuit's reasoning in Miller, where the CEO of the defendant company, two general managers, and two managers were deemed not to be subjected to individual liability under the ADEA or Title VII. 991 F.2d at 587-88. This precedent establishes Dutton's individual liability may not be premised upon his position with the company.

Accordingly, McDowell's ADEA claim against Dutton in his individual capacity is dismissed.

      2.    ADEA claim asserted against Axsys

The ADEA makes it unlawful for an employer to fire a person who is at least forty years old because of his/her age. 29 U.S.C. §§ 623(a), 631(a). For McDowell to prevail on his age-

based discrimination claim, he must show that his age "actually motivated and had a determinative influence on [defendants'] decision to fire him." Reeves v. Sanderson Plumbing Prods., Inc., 530 U.S. 133, 141 (2000). McDowell can meet his burden either by presenting direct evidence of discrimination, or by circumstantial evidence. Keller v. Orix Credit Alliance, Inc., 130 F.3d 1101, 1108 (3d Cir. 1997). If the Court determines that McDowell has adduced direct evidence of discrimination, it does not examine the record for circumstantial evidence: "The McDonnell Douglas test is inapplicable where plaintiff presents direct evidence of discrimination." Fakete v. Aetna, Inc., 308 F.3d 335, 340 (3d Cir. 2002) (quoting Swierkiewicz v. Sorema N.A., 534 U.S. 506, 511 (2002)).

For evidence to be "direct" it must "be sufficient to allow the jury to find that the decision makers placed a substantial negative reliance on the plaintiff's age in reaching their decisions." Glanzman v. Metropolitan Management Corp., 391 F.3d 506, 512 (3d Cir. 2004) (citing Fakete v. Aetna, Inc., 308 F.3d at 338). Upon the showing of direct evidence, the burden shifts to the defendant employer to prove that it would have fired the plaintiff even if it had not considered his/her age. Price Waterhouse v. Hopkins, 490 U.S. 228, 276 (1989) (O'Connor, J. concurring). Here, McDowell contends that Dutton's remark *"I think you've been here too long, you should retire"* is direct evidence of defendants' "true motive"– to "dismiss an aging employee with a $50,000 salary and replace him with an employee barely half his age with less salary."[1] (Pltf's Opposition, at 6; Pltf's Letter dated January 14, 2005.) The Court agrees that this statement constitutes direct evidence of discrimination because it was made by a person involved in the

---

[1] Defendants concede, for the purposes of this motion only, that Dutton made this statement. (See Defts' Brief, at 25.)

-12-

decisionmaking process[2] just prior to the allegedly discriminatory act.  Viewing the remark favorably to McDowell, a reasonable juror could find that saying "I think you've been here too long, you should retire," suggests age substantially motivated defendants' decision.  See Price Waterhouse, 490 U.S. at 277; Fakete, 308 F.3d at 338-39; Connors v. Chrysler Financial Corp., 160 F.3d 971, 976 (3d Cir. 1998).

Because McDowell has presented the necessary "quantum of direct evidence of discrimination," the burden of going forward shifts to defendants.  Glanzman, 391 F.3d at 514.  At the summary judgment stage, the burden of going forward in the face of "direct" evidence is high, because defendants "must leave *no* doubt that a rational jury would find that [defendants] would have fired [McDowell] even if it had not been for the discriminatory statement."  Id.  While still maintaining that the remark does not constitute direct evidence, defendants assert they can meet this high evidentiary standard because even viewing Dutton's statement most favorably to McDowell.  Their argument is that a rational fact finder would surely find, based on this record, that defendants would have fired McDowell anyway, without consideration of age.  (Defts' Reply Brief, at 4; Defts' Letter dated January 10, 2005.)

To support their position, defendants point to deposition testimony proving McDowell left packages marked "Must Go Today" overnight so that they did not go until the next day, and that other AST employees received complaints from customers and other co-workers regarding his poor performance.  (Defts' Reply Brief, at 4-8.)  While the Court acknowledges that defendants have produced several examples of this type of testimony, the record also indicates that the remarks

---

[2] Defendants acknowledge that Dutton, urged by Mr. Ryder, made the decision to terminate McDowell.  (Defts' Brief, at 13.)

-13-

about poor performance did not find their way into negative comments in McDowell's written evaluations, and indicates as well that other employees would leave packages "Must Go Today" overnight, and that McDowell was never formally disciplined until his termination.  Further, McDowell disputes the specifics of his performance evaluations (all of which rate his performance average) and the number of times he was issued warnings that his actions were serious violations of company policy.   In context, these disputed facts are material.

As such, the Court finds that the evidence of record does not demonstrate that a rational juror would find that defendants would have fired McDowell even if they had not considered his age.  Consequently defendants have not succeeded in meeting their burden under Price Waterhouse at this stage of the litigation.  See Fakete, 308 F.3d at 339.

### B. Count II: McDowell's ERISA claim

It is undisputed that during the years McDowell worked at AST, the company matched his 401K contributions up to three percent of his salary.  McDowell claims that defendants terminated his employment "to preclude plaintiff's continued eligibility and participation in AST's 401(K) as well as its subsidized health plan," in violation of § 510 of ERISA.  (Complaint, ¶ 14.)

Defendants seek summary judgment on this Count because they allege that McDowell has not provided sufficient evidence to establish a prima facie case.  The Court agrees, because to establish a prima facie case under § 510, McDowell must show that  (1) defendants engaged in prohibited conduct; (2) for the purpose of interfering; (3) with the attainment of any right to which the employee may become entitled to.  Dewitt v. Penn-Del Directory Corp., 106 F.3d 514, 522 (3d Cir. 1997).  Essentially, McDowell must demonstrate that defendants had "specific

intent" to violate ERISA – that they "made a conscious decision to interfere with [McDowell's] attainment of pension eligibility or additional benefits." Id. at 523.

McDowell's position that Dutton's remark that he should *"retire now,"* plus his loss of continued employer contributions, are insufficient to establish "specific intent." Dewitt establishes that the loss of future employer contributions alone is insufficient to show specific intent: "Where the only evidence that an employer specifically intended to violate ERISA is the employee's lost opportunity to accrue additional benefits, the employee has not put forth evidence sufficient to separate that intent from the myriad of other possible reasons for which an employer might have discharged him." Id. at 523.  On its face, and drawing all possible inferences that could favor plaintiff's cause, Dutton's remark that "I think you've been here too long, you should retire," standing unadorned, simply does not reflect a specific intent to interfere with McDowell's 401(k) plan and health benefits.

Because McDowell has not presented sufficient evidence to establish a prima facie case under § 510, the Court grants summary judgment as to the ERISA claim in Count II.

### III. CONCLUSION

For the aforementioned reasons, McDowell's ADEA claim against Axsys survives summary judgment.  His ADEA claim asserted against Dutton in his individual capacity and his ERISA claim against Axsys are dismissed.


Date:   May 23, 2005

                                                   s/ Katharine S. Hayden
                                                   Katharine S. Hayden, U.S.D.J.